331 So.2d 44 (1976)
Richard P. GUIDRY, Plaintiff-Appellant,
v.
Charles William ROBERTS et al., Defendants-Appellees.
No. 10693.
Court of Appeal of Louisiana, First Circuit.
April 12, 1976.
Rehearing Denied April 15, 1976.
Writ Granted May 27, 1976.
*46 David W. Robinson, Baton Rouge, for plaintiff-appellant.
Wm. J. Guste, Jr., Atty. Gen., Kenneth DeJean, and Steve George, Asst. Attys. Gen., Baton Rouge, for defendants-appellees.
Before SARTAIN, LOTTINGER and EDWARDS, JJ.
SARTAIN, Judge.
Plaintiff instituted this suit seeking a declaration of invalidity and an injunction against the enforcement of the Louisiana Election Campaign Finance Disclosure Act. Acts 1975 No. 718, R.S. 18:1481-1493. He attacked the legislation, alleging violation of various provisions of the Louisiana Constitution of 1974, including infringement on certain rights contained in Article I, and usurpation of powers vested in other branches of government by the legislature as condemned by Article II. The trial court rejected the contentions of invalidity and plaintiff has appealed therefrom.
It is asserted that the plaintiff-appellant does not have standing to question the validity of the act.
*47 The legislation in question purports to require the reporting of information regarding contributions and expenditures pertinent to campaigns for elective state and local public office, decries certain activities as illegal campaign practices, condemns violation of the act to be a misdemeanor, and establishes the machinery and procedure for administration and enforcement of the provisions of the act.
R.S. 18:1486C(2) requires the reporting of the full name and address of each person making one or more contributions to a political committee or candidate which singly or in the aggregate exceeds the reporting amount specified in R.S. 18:1482(11). Section H of R.S. 18:1486 requires that the reports shall be made available for public inspection.
Appellant alleged and testified to being a citizen and taxpayer who had been and was active in the financing of political campaigns. He stated that the fact of disclosure of such a role prevented him from contributing in excess of the reporting amount to any candidate he favored.
C.C.P. 1872 grants to those who are affected by a statute the right to seek a judicial determination of its validity, stating:
"A person interested under a deed, will, written contract or other writing constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder."
Standing is a concept utilized to determine if a party is sufficiently affected so as to ensure that a justiciable controversy is presented to the court. The requirement of standing is satisfied if it can be said that the plaintiff has a legally protectible and tangible interest at stake in the litigation. See, Hainkel v. Henry, 313 So.2d 577 (La.1975); Abbott v. Parker, 259 La. 279, 249 So.2d 908 (1971).
We find that the plaintiff falls within the class of individuals affected by the statute. His right to participate in the political process through the utilization of property as well as through his vote is a legally protectible and tangible interest which is, and will continue to be, affected by Act 718 of 1975. Therefore, he has standing to contest the validity of the disclosure provisions of the act.
The appellees argue further, however, that even if the appellant has standing to controvert the disclosure provisions of the act as being in violation of the guarantees of personal liberty contained in Article I of our constitution, his status as a mere campaign contributor and citizen does not establish standing to question the validity of the administrative and enforcement provisions. This contention is without merit for two reasons. First, the administrative provisions are the instrumentality through which the disclosure provisions are made operative. As such, they affect the appellant just as the disclosure provisions do. It is untenable to say that one has standing to attack the substantive provisions of a statute but does not have standing to controvert the procedural provisions effectuating the substantive provisions. Considering a similar contention the court said in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976):
"Party litigants with sufficient concrete interests at stake may have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights."
Second, as we shall subsequently amplify, the disclosure provisions are not severable from the administrative and enforcement provisions. Standing to contest *48 one facet of an unseverable legislative act, of necessity, constitutes standing to contest all facets of the act. State ex rel. Kemp v. City of Baton Rouge, 215 La. 315, 40 So.2d 477 (1949). We, therefore, find that the plaintiff-appellant has standing to prosecute this action.
Since we find merit in the allegations that the administrative and enforcement provisions of Act 718 of 1975 are unconstitutional, we do not consider the other assertions of the appellant.
The following is a survey of the pertinent provisions of Act 718.
The reports required by the act are to be filed with reporting officials. R.S. 18:1483(A). The reporting official with respect to candidates for the Senate and political committees supporting only such candidates is designated to be the secretary of the Senate. The clerk of the House of Representatives is designated as the reporting official for candidates for the House and political committees supporting only such candidates. The reporting official for all other candidates, political committees and other persons required to file reports is the legislative auditor. R.S. 18:1482(12).
After receipt the reports are to be referred to supervisory committees for review. The supervisory committee with respect to candidates for the Senate is designated to consist of the secretary of the Senate, the legislative auditor and the executive director of the legislative council. The committee supervising candidates for the House of Representatives consists of the clerk of the House, the legislative auditor and the executive director of the legislative council. The committee supervising all other candidates and other persons required to report consists of all the persons occupying the above named positions. R.S. 18:1492(A)(1).
If, after review of a report or upon sworn complaint, the appropriate supervisory committee determines there is substantial reason to believe the act has been violated, it shall make a thorough investigation. If the results indicate a knowing and willful violation has occurred, the committee is directed to forward the matter to the attorney general. The attorney general shall make such investigation as is deemed necessary; and if he determines there is substantial reason to believe a violation has occurred, he shall forward the matter to the appropriate district attorney who is directed to proceed with such criminal action as is justified.[1] R.S. 18:1492(B)(1).
The second paragraph of R.S. 18:1492(B)(1) specifically prohibits a district attorney from instituting a criminal action under the act except on the basis of information forwarded to him.
The executive director of the legislative council is appointed by the legislative council which consists of seventeen members of the legislature and the lieutenant governor. He may not be a member of the legislature, and he serves at the pleasure of the legislative council. See R.S. 24:401; 404.
The clerk of the House of Representatives and the secretary of the Senate are clerical officers of the respective houses of the legislature. Article 3, § 7(C), Louisiana Constitution of 1974. According to testimony adduced in this matter, each is elected by the house he serves.
The office of legislative auditor is created by the Constitution. Article III, § 11, Louisiana Constitution (1974). The person holding that office is elected by the legislature and serves at its pleasure. Article XIV, § 27(C), Louisiana Constitution (1974); Article VI, § 26(2), Louisiana Constitution (1921).
*49 Article II, §§ 1 and 2, Louisiana Constitution (1974) provide:
"Section 1. The powers of government of the state are divided into three separate branches: legislative, executive, and judicial.
"Section 2. Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others."
The history of Article II, §§ 1 and 2, Louisiana Constitution (1921), which are substantially the same as the current provisions, was set forth in Saint v. Allen, 169 La. 1046, 126 So. 548 (1930), where the court said:
"To illustrate, we quote from The Federalist, vol. 1, No. 51 (Hamilton or Madison) pp. 353, 354, viz.:
"`In order to lay a due foundation for that separate and distinct exercise of the different powers of government, which to a certain extent is admitted on all hands to be essential to the preservation of liberty, it is evident that each department should have a will of its own, and consequently should be so constituted that the members of each should have as little agency as possible in the appointment of the members of the others. * * *
"`It is equally evident that the members of each department should be as little dependent as possible on those of the others, for the emoluments annexed to their offices. Were the executive magistrate, or the judges, not independent of the Legislature in this particular, their independence in every other would be merely nominal.'
"We find also in the same volume of The Federalist, p. 340, No. 48, the intention of Madison, viz.:
"`As the legislative department alone has access to the pockets of the people, and has in some constitutions full discretion, and in all a prevailing influence over the pecuniary rewards of those who fill the other departments, a dependence is thus created in the latter, which gives still greater facility to encroachments of the former.'
"And in No. 47, at page 338 of the same volume, we find Madison's admonition, with regard to the preservation of the independence of each department of government, viz.:
"`It is equally evident that, in reference to each other, neither of them ought to possess, directly or indirectly, an overruling influence in the administration of their respective powers. It will not be denied that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it.'
"In No. 47, on pages 330 and 332 of the same volume, Madison refers to Montesquieu as the author of this doctrine of the independence of each department of government, viz.:
"`The oracle who is always consulted and cited on this subject is the celebrated Montesquieu. If he be not the author of this invaluable precept in the science of politics, he has the merit at least of displaying and recommending it most effectually to the attention of mankind. Let us endeavor, in the first place, to ascertain his meaning on this point. * * *
"`The reasons on which Montesquieu grounds his maxim are a further demonstration of his meaning, "When the legislative and executive powers are united in the same person or body," says he, "there can be no liberty, because apprehensions may arise lest the same monarch or senate should enact tyrannical laws to execute them in a tyrannical manner." *50 * * * Some of these reasons are more fully explained in other passages; but, briefly stated as they are here, they sufficiently establish the meaning which we have put on this celebrated maxim of this celebrated author.'
"The excerpt quoted from Montesquieu by Madison appears in the Analysis by D'Alembert of The Spirit of Laws, vol. 1, Book 11, chap. 11, page 174.
"According to article 18 of the Civil Code, the universal and most effectual way of finding the true meaning of a law, if its expressions are doubtful, is to consider the reason and spirit of it, and the cause which induced its adoption. Hence, for an accurate understanding of this article in the Constitution of Louisiana, and its applicability to the case before us, we must trace the history of the article, and consider the reason which induced its authors to write itthe object which they intended to accomplish, and the evils which they intended to avoid.
"The importance of sections 1 and 2 of article 2 of the Constitution of Louisiana is manifested in some measure by their being the whole article; which, in substance, appeared in every Constitution Louisiana has had, except that of 1868, which is generally referred to as the Carpet Bag Constitution. Louisiana's first Constitution, adopted in 1812, was virtually copied from the Constitution of Kentucky. In her first Constitution, that of 1792, and in her Constitution of 1799, article 1 was as follows:
"`Section 1. The powers of the government of the State of Kentucky shall be divided into three distinct departments, and each of them be confided to a separate body of magistracy, to wit: those which are legislative, to one; those which are executive, to another; and those which are judiciary, to another.
"`Section 2. No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others; except in the instances hereafter expressly directed or permitted.'
"That language was copied literally as article 1 of Louisiana's Constitution of 1812; and, by the jurisprudence of the state of Kentucky, particularly the opinions rendered in Commissioners of Sinking Fund v. George, 104 Ky. 260, 47 S.W. 779, 84 Am.St.Rep. 454, and Pratt v. Breckinridge, 112 Ky. 1, 65 S.W. 136, 66 S.W. 405, we are reminded that article 1 of the first Constitution of Kentucky, which afterwards became article 1 of the first Constitution of Louisiana, was written by Thomas Jefferson himself. Having returned from France, and having been appointed Secretary of State, on being informed that the state of Virginia was about to permit Kentucky to become a separate state, and that Kentucky was about to adopt a Constitution, he advised that the first safeguard to be put into the Kentucky Constitution should be to confine absolutely and exclusively to each one of the three departments of government the powers belonging to it alone. He went so far as to say that there was danger in the Federal Constitution in that the clauses defining the powers of each department of the government were not a sufficient safeguard against an exercise by one department of powers properly belonging to another; and so he wrote the provision which he recommended, and which became article 1 of the Constitution of Kentucky, and sent it to the Convention, in session at Danville; and, when the delegates learned who was the author of the article, says Judge Du Relle, `the respect of Kentucky for the great name of Jefferson carried it through, and it was at once adopted.'
*51 "It is observed in the course of the opinion which we have referred to, in the Kentucky case, that the Constitution of the United States merely provides, in one article (article 1, § 1), that `all legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives'; and it provides, in another article (article 2, § 1), that the executive power shall be vested in the President of the United States; and it provides in another article (article 3, § 1), that the judicial power shall be vested in the courts. Commenting thereon, the author of the opinion (104 Ky. 260, 47 S.W. 779, page 785, 84 Am.St.Rep. 454) says:
"That is the extent of the departmental division under the federal constitution. The Kentucky constitution goes much further; and, had Mr. Jefferson been in America at the time of the adoption of the federal constitution, that instrument would, in all probability, have contained the enactment which we find only in the constitution of Kentucky, with its three distinct provisions: First, that the government shall be divided into three distinct departments; second, that each of them shall be confided to a separate body of magistracy; and, third, that no person or collection of persons shall exercise any power properly belonging to either of the others, except in the instances thereinafter expressly directed or permitted.'
"We note that Judge Du Relle, in his opinion in the Kentucky case, characterized those provisions as `the enactment,' which he found only in the Kentucky Constitution. Judge Du Relle's opinion, when rendered, was not authority, except for the historical information which it contained, because the majority of the members of the court did not then agree with him that the Kentucky statute in question was unconstitutional; but Judge Du Relle's opinion afterwards became authority, for it was adopted as the prevailing opinion in Pratt v. Breckinridge, 112 Ky. 1, 65 S.W. 136, 66 S.W. 405; where it was held that the Legislature had not, under its authority to create a public office, the power to elect or appoint the officer or officers to fill it.
"The `Constitution or Form of Government for the Conmmonwealth of Massachusetts,' as it was originally styled, and as adopted in 1780, was written by John Adams, substantially as adopted; and it has ever since remained the Constitution of that state. In article 30 of part the first, the safeguard, of which section 2 of article 2 of Louisiana's Constitution is intended to be the counterpart, is expressed thus:
"`30. In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men.'
"That lofty ideato the end that it may be a government of laws and not of menwas in the mind of the statesmen who afterwards wrote the Constitution of the United States, although the idea was not specifically expressed. John Marshall, in Marbury v. Madison, in 1803 (1 Cranch, 163, 2 L.Ed. 69), said:
"`The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right.'
*52 "And we may say, as appropriately, that the government of Louisiana will certainly cease to deserve this high appellationa government of laws and not of menif the laws furnish no remedy for a violation of the very article of the Constitution which that appellation comes from."
We are confronted with the question of whether the persons designated to administer and enforce this act may properly do so considering their affiliation with the legislative branch.
As discussed above, each reporting official and the supervisory committees consists of the persons holding designated positions within the legislative branch. Do these positions constitute "offices" within the meaning of the constitution so as to prevent those holding them from exercising executive or judicial functions? As we noted earlier, the clerk of the House and the secretary of the Senate are declared to be clerical officers by the constitution, the position of legislative auditor is created by the constitution and the executive director of the legislative counsel is a position created by statute.
A state office has been defined simply as one created by the constitution or the legislature. State v. Titus, 152 La. 1011, 95 So. 106 (1922); State v. Rogers, 138 La. 867, 70 So. 863 (1916). See, State ex rel. Porterie v. Jones, 181 La. 390, 159 So. 594 (1935). We cite with approval the definition found in Cherry v. Hall, 270 So.2d 626 (La.App.2d Cir. 1972), which states:
"In certain aspects or for particular purposes, one may or may not be considered a public officer or a public figure, but, where the Constitution or an act of the Legislature creates a position, fixes the compensation therefor, and prescribes the duties thereof, and these duties, not occasional or temporary in character but of a continuing and permanent nature, pertain to the public, such position or employment is an office, and the one who occupies it is an officer."
The considerations cited by the court in Saint v. Allen, supra, require that a broad definition be given the term "office" where utilized in the context of separation of powers. The definition found in Cherry, supra, is of sufficient breadth and is also sufficiently rigorous to set a readily ascertainable standard. Applying this standard to the various positions enumerated in Act 718 of 1975, we find that each satisfies the definition and is thus an office within the meaning of Article II, § 2 of our current constitution.
We first consider if the functions of the supervisory committees constitute an exercise of the judicial power. Article V, § 26(B), La.Const. (1974), provides:
"Except as otherwise provided by this constitution, a district attorney, or his designated assistant, shall have charge of every criminal prosecution by the state in his district, be the representative of the state before the grand jury in his district, and be the legal advisor to the grand jury. He shall perform other duties provided by law." (Emphasis added).
Even before the district attorneys were expressly granted the power to control criminal prosecutions it was held that they were constitutionally vested with the primary authority to institute and prosecute criminal actions. Kemp v. Stanley, 204 La. 110, 15 So.2d 1 (1943). The measure of the power of a district attorney to control a criminal prosecution is indicated by Article IV, § 8, which prohibits the attorney general, the chief legal officer of the state, from instituting, prosecuting or intervening in a criminal action except for cause when authorized by a court having original jurisdiction. It is clear that a district attorney has the sole authority to *53 determine when and against whom a criminal charge shall be instituted subject only to the power vested in the attorney general to supercede that authority upon a showing of cause.
The concluding paragraph of R.S. 18:1492(B)(1) states:
"Criminal actions shall be initiated under the provisions of this Part only by the district attorney and only on the basis of information forwarded to him by a supervisory committee through the attorney general, or directly, as provided in this Part, except in the case of campaigns for district attorney, in which case criminal actions shall be initiated under the provisions of this Part only by the attorney general as provided in this Part and only on the basis of information forwarded to him by a supervisory committee as provided in this Part."
The preceding paragraph of this section makes review of the required reports discretionary and requires an investigation of a complaint or possible violation disclosed by a report where there is substantial reason to believe a violation has occurred. After investigation the committee shall forward the results to the attorney general if the investigation indicates a knowing and willful violation has occurred. If the attorney general determines there is substantial reason to believe a violation has occurred he shall forward the information to the appropriate district attorney for the institution of criminal proceedings.
The clear intent of R.S. 18:1492(B)(1), as evidenced by its language, is to preclude a district attorney from instituting a criminal action thereunder until after the committee and the attorney general have determined there is cause to proceed. A district attorney does not have the authority to proceed under the act until authorized by others.
The power to institute a criminal action includes necessarily the authority to determine who such actions shall be instituted against. This power belongs solely to the district attorney who is part of the judicial branch. Thus, Act 718 of 1975 constitutes an attempt to transfer the exercise of powers belonging to the judicial branch to persons holding office in the legislative and executive branches and is unconstitutional to the extent that it authorizes such exercise of power. See, Kemp v. Stanley, supra.
Next, we consider whether the reporting officials and supervisory committees, who consist solely of persons holding office in the legislative branch, may administer this law aside from the provisions pertinent to the institution of criminal actions.
Act 718 of 1975 purports to affect all campaigns for state and local elections. The ministerial duties regarding receipt, public inspection and forwarding of campaign reports are placed in reporting officials. Even without the objectionable provisions struck down above the supervisory committees would retain the authority to review reports and investigate possible violations.
It has been recognized that the administration of laws is an executive function. See, State ex rel. Porterie v. Smith, 184 La. 263, 166 So. 72 (1935). More specifically, it has been recognized that administration of a law similar in many respects to that before us is an executive function. Buckley v. Valeo, supra. Article IV, § 1(A), La.Const. (1974), provides:
"The executive branch shall consist of the governor, lieutenant governor, secretary of state, attorney general, treasurer, commissioner of agriculture, commissioner of insurance, superintendent of education, commissioner of elections, and all other executive offices, agencies, and instrumentalities of the state. (Emphasis added).
*54 We can only construe the emphasized language to mean that an officer, agency or instrumentality exercising an executive function is included within the executive branch. Administration or execution of a law is an executive function and those who administer or execute laws are part of the executive branch.[2] If exercise of a particular function is sufficient to bring an instrumentality within the executive branch it is apparent that the function is a power belonging to the executive branch.
We therefore find that the reporting officials and supervisory committees are exercising an executive power by administering the provisions of Act 718. Since we have already found these to be persons holding office in the legislative branch, their duties and functions under the act are in violation of Article 2, § 2 of our constitution. Further, it would be violative of Article 2, § 2, of our constitution for the legislature to designate any position or appoint any individual over which it exercises control and authority to any board, commission, agency or position which is to perform any function or exercise any authority over either the executive or judicial branches of state government.[3]
Of equal significance is the fact that in the enactment of Act 718, the Legislature by designating the composition of the supervisory committees in the manner set out above in effect reserved unto itself the power of appointment. This the legislature can not do.
It appears that considerable portions of Act 718 are modeled after the Federal Election Campaign Act (1971, as amended by 1974). 2 U.S.C.A. § 431 et seq. In the federal act, there is created the Federal Election Commission (F.E.C.). This commission is composed of eight members, viz.: the Secretary of the Senate and the Clerk of the House, as ex-officio and without the right to vote, two members appointed by the President Pro-tempore of the Senate, two members appointed by the Speaker of the House, and two members appointed by the President of the United States, all to be confirmed by majority vote of both houses of the Congress. In Buckley v. Valeo, supra, the United States Supreme Court held that the appointment of members to the F.E.C. by either house of the Congress violated the appointments clause of the federal constitution. U.S. Constitution, Art. II, Sec. 2, cl. 2. Our legislature fell into the same error.
Article 4, § 5(H) of the Louisiana Constitution of 1974, provides in pertinent part:
"(1) The governor shall, appoint, subject to confirmation by the Senate, the head of each department in the executive branch whose election or appointment is not provided by this constitution and the members of each board and commission in the executive branch whose election or appointment is not provided by this constitution or by law."
Thus, it is clear that our present constitution vests appointing authority in the governor in all cases where such appointment is not provided for in the constitution itself or "by law."
"By law" is a limiting factor on the power of appointment. It is not, however, a blanket loophole whereby the power of appointment may be completely usurped.
*55 The Legislature in the creation of a board or commission to oversee the function of an agency may prescribe that a certain appointee(s) be from a designated group(s) or otherwise possessed of certain qualifications so as to bring to that board or agency a given viewpoint(s) or expertise as will aid the board or commission in the discharge of the purpose for which the agency was created. In the instant matter it is not contended that such is the case.
We now turn to the question of whether the unconstitutional portions of this act are severable from the remaining provisions. Act 718 of 1975 contains a severability clause which states:
"If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items or applications of this Act which can be given effect without the invalid provisions, items or applications, and to this end the provisions of this Act are hereby declared severable."
We have found the legislative appointment of the reporting officials and supervisory committees to be invalid as well as the role of the supervisory committees in instituting criminal proceedings. We must consider whether the remainder of the act can reasonably function without the offending provisions, or, if not, must the entire act fall. In Roy v. Edwards, 294 So.2d 507 (La.1974), the court, quoting with approval from Gaudet v. Economical Supermarket, Inc., 237 La. 1082, 112 So.2d 720 (1959), said:
"Of course, it is well established that the unconstitutionality of a portion of a statute (or ordinance) does not necessarily invalidate the whole, particularly where there is a severability clause as here. But it is equally well settled that such rule applies only when the inconstitutional part is independent of and separable from the rest. If it is so interrelated and connected with the other portions as to raise the presumption that the legislative body would not have enacted one part without the remainder, then the entire enactment is null."
It is apparent that the act before us cannot function without the supervisory committees and reporting officials. The required reports are meaningless without someone to receive and review them. To require such reports under the circumstances would ask candidates and others to do a vain and useless thing. We can not say that the legislature would have enacted this legislation without the offending portions. These offending portions are so interrelated as to clearly justify the presumption that the legislature would not have enacted this legislation without them.
For the reasons assigned above, Act 718 of 1975 is declared null and the enforcement of its provisions should be prohibited and enjoined. Accordingly, the judgment appealed is reversed and this matter is remanded for the purpose of having the district court issue appropriate injunctions enjoining its enforcement.
All such costs as are permitted by law are assessed against the defendants.
REVERSED AND REMANDED.
NOTES
[1] This sequence is altered if a campaign for the office of attorney general or district attorney is involved; however, the difference is not material here.
[2] We expressly do not rule that administration of an act with a legislative purpose is an executive function. The legislature may always perform those acts necessary or helpful to its function. See, e. g. R.S. 24:401; 404. However, the act before us obviously does not have as its purpose the furtherance of the legislative function.
[3] For an excellent discussion on separation of powers and more particularly "extra-legislative control statutes" in the federal scheme, see Watson, Congress Steps Out; A Look at Congressional Control of the Executive, 63 Cal.L.R. 983.